UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at Pikeville)

| | | |
|---|---|---|
| WILLIS D. COOK, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7: 19-119-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| ANDREW SAUL, | ) | **MEMORANDUM OPINION** |
| Commissioner of Social Security, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Willis Cook ("the plaintiff" or "Cook") seeks judicial review of the Commissioner of Social Security's denial of his application for disability insurance benefits. Specifically, he contends that the Administrative Law Judge ("ALJ") assigned to his case did not evaluate the opinion evidence properly or consider the combined effects of his impairments. However, the Commissioner's decision will be affirmed because it is supported by substantial evidence and is based on a proper application of the law. The Commissioner's motion for summary judgment will be granted, and the plaintiff's will be denied.

## I.

Cook filed an application for disability insurance benefits ("DIB") on August 9, 2016. [*See* Administrative Transcript, hereafter, "Tr.," 169.] However, his application was disapproved initially and on reconsideration. [Tr. 96, 105] Cook thereafter requested a hearing before an administrative law judge ("ALJ"). [Tr. 112] ALJ Jonathan Stanley held an administrative hearing by video conference on September 18, 2018, and issued a written decision denying benefits on November 25, 2018. [Tr. 40-68; 20-33] The ruling became the

- 1 -

Commissioner's final decision when the Appeals Council denied the plaintiff's request for review on October 18, 2019. [Tr. 1-3] The matter is ripe for judicial review. *See* 42 U.S.C. § 405(g).

## II.

The plaintiff was 53 years old at the time of the ALJ's decision. He lived with his wife and two adult children in Jeremiah, Kentucky. [Tr. 44] Cook held a driver's license and drove several times per week. [Tr. 46] He had graduated from high school and completed two years of vocational school where he received some training in electricity. [Tr. 47] Cook later obtained a certification as a coal miner and worked in that field for 26 years. [Tr. 47, 60] He was employed primarily as a roof folder operator by Enterprise Mining from 2006 to 2016. [Tr. 51] Cook reported that he was either on his feet or crawling when performing this work and was required to lift up to 60 pounds. There were occasions when he worked third-shift, doing "just whatever needed to be done." Cook was required to be on his feet nearly all the time when he performed this work, and was required to lift up to 125 pounds. [Tr. 54]

Cook advised the ALJ that he suffered from a herniated disc in his neck which began causing symptoms in 2008. He reported that his arms would go numb and he could no longer feel the equipment he was required to run while working. [Tr. 56] Cook rated his neck pain as a nine out of ten and reported that pain ran into his left arm. He added that he had been diagnosed with severe carpal tunnel syndrome and that he frequently dropped things.

Cook also reported that he had been diagnosed with a herniated disc in his lower back. He rated his back pain as an eight out of ten and stated that it extended into his left leg. He also complained of bilateral knee pain and stated that he was unable to squat. [Tr. 58] He reported falling once or twice a week due to his knees giving out.

Cook further advised that he had been diagnosed with COPD and used oxygen continuously at night and with most activities during the day.  He reported that he suffered from hearing loss and a diminished ability to concentrate, as well as headaches four or five times per month.  [Tr. 57]  Cook reported that his arthritis specialist removed him from work in 2016 due to problems with his neck, back, hands, and knees.  [Tr. 59-60]

Cook established care at the Ace Clinique of Medicine in Hazard, Kentucky in 2008.  [Tr. 305]  Dr. James "Ace" Chaney diagnosed Cook with impaired nerve conduction and recommended an MRI of the cervical spine.  [Tr. 305]  Shortly thereafter, Ace Clinique performed numerous imaging studies of Cook's brain, cervical spine, lumbar spine, and left knee. Cook's brain MRI was normal. [Tr. 354] However, other reports revealed degeneration, including multilevel disc space narrowing and osteophyte formation in the neck.  Additionally, there was "severe disc space narrowing and osteophyte formation" at L4-L5 and L5-S1 and, to a lesser degree, at L3-L4.  [Tr. 349-50]  Imaging studies showed osteoarthritis in the left knee, as well as mild arthritis in the left hip.  [Tr. 306-70; 342]

Dr. Chaney prescribed Lortab and administered injections to Cook's cervical spine, shoulder, and knee.  [Tr. 371, 376, 403, 585]  Ace Clinique performed additional MRIs of the cervical and lumbar spine in October 2010.  Again, bulging discs and osteophyte formations were noted at several levels in the cervical spine, most notably at C5-6 and C6-7.  [Tr. 438]  There was no disc herniation at any level.  [Tr. 439]  Similarly, Cook's lumbar spine showed disc bulging and osteophyte formation, particularly at L4-5 and L5-S1, with no disc herniation at any level.  [Tr. 443]

Ace Clinique performed an additional MRI of the left knee in February 2011.  It revealed severe osteoarthritis with marked destruction of the medial meniscus.  [Tr. 567]  Dr.

- 3 -

Chaney referred Cook to Mukat Sharma, M.D., at the Appalachian Orthopedic and Spine Center the following month.  [Tr. 467]  Sharma observed localized swelling, patellar crepitus, and tenderness in the left knee.  Cook could flex his left knee to 120 degrees, but pain was present throughout the range of motion.  Sharma assessed osteoarthritis and recommended a total knee arthroplasty.  [Tr. 468]  However, Cook did not want to proceed with surgery at that time.  [*See* Tr. 475.]

Chaney also referred Cook to Ballard Wright, M.D., a pain management specialist, in June 2012.  [Tr. 474]  Wright determined that Cook was doing reasonably well with his current pain management medications but thought that he might benefit in the future from injective therapy and/or nerve blocks.  Wright advised Cook that it was important to treat his carpal tunnel syndrome to prevent permanent nerve damage.  Cook indicated he would discuss this with Dr. Chaney.  [Tr. 476]

Jayalakshmi Pampati, M.D., at the Mountain Afterhours Clinic Arthritis and Osteoporosis Center treated Cook's neck, back, and knee pain from 2015 through 2018.  Pampati prescribed medications including Aleve, aspirin, Neurontin, and Norco, and provided Synvisc injections.  [Tr. 780-81; 876-962; 972-1012]

Cook also saw orthopedic surgeon, Keith Pugh, M.D., at Pikeville Medical Center in November 2015, for complaints of continuing left knee pain.  [Tr. 725]  An x-ray performed at that time revealed advanced tricompartmental osteoarthritis with changes most pronounced in the medial compartment.  [Tr. 733]  Pugh advised Cook that his pain was likely coming from arthritis and that he may benefit from a total knee arthroplasty.  However, at that point, Cook did not desire surgery and attempted to manage it conservatively using a Synvisc injection.  [Tr. 731]

- 4 -

Cook saw neurologist Sujata Gutti, M.D., in February 2016.  [Tr. 679]  Gutti diagnosed Cook with moderate bilateral carpal tunnel syndrome, right worse than left.  She advised Cook to have surgery, but he wanted to wait.  Mahmoud Alam, M.D., cleared Cook for carpal tunnel surgery in February 2018, but it appears that he never underwent the procedure.  [Tr. 1087-1094]

An audiologist at Beltone Hearing Care Center diagnosed Cook with hearing loss in July 2016.  [Tr. 687]  A few months later (October 2016), Cook presented to Pikeville Medical Center complaining of left face, arm, and leg numbness.  [Tr. 711]  Neurologist Naveed Ahmed, M.D., ordered an MRI of Cook's brain.  [Tr. 716]  But like the previous study of Cook's brain, the MRI was normal.  [Tr. 722]

David Muffly, M.D., evaluated Cook for a workers' compensation claim on December 1, 2016.  [Tr. 757]  Muffly noted that Cook was five feet, eight and one-half inches tall, and weighed 276 pounds.  [Tr. 758]  His grip strength was 55 pounds on the right, and 81 pounds on the left.  Cook reported being right-hand dominant.  His arm strength and movement were normal.

Cook exhibited a limp on the left side and could not complete a full squat.  However, Muffly rated Cook's leg strength as normal and reported that no atrophy was present.  Cook could extend his left knee fully and could flex it to 120 degrees.  Sensation was diminished in both the left calf and foot.  Finally, the cervical and lumbar spinal areas were tender, with spasms present.  Dr. Muffly concluded that Cook had cervical disc herniation/multiple level degenerative disc disease but could not confirm that cervical radiculopathy was present.  [Tr. 760]

Muffly determined, for purposes of the workers' compensation claim, that Cook was limited to lifting 20 pounds, should avoid repetitive use of his hands, frequent turning of his neck, bending and stooping, could not crawl or climb, and had a "24% whole person impairment."

In January 2017, Cook reported that he had gained 30 pounds since quitting work, which increased his pain level. [Tr. 787] He began physical therapy for low back and knee pain per Dr. Pampati's recommendation that same month. [Tr. 769] It appears that he completed three treatments and did not return to therapy. [Tr. 778]

Cook saw Robert Royalty, M.D., a sports medicine specialist, for bilateral knee pain in April 2017. [Tr. 969] Royalty noted that Cook's knee range of motion was zero to 120 degrees, with pain at each extreme. Additionally, there was pain upon palpation of the medial joint lines and Cook walked with a slight limp. [Tr. 971] Dr. Royalty recommended Depo-Medrol injections to both knees. [Tr. 971] Cook returned in December 2017 and reported that the injections had provided minimal relief. [Tr. 966] Royalty then recommended bilateral Depo-Medrol at a higher dose. [Tr. 968] When Cook returned in March 2018 with the same complaints, Royalty explained the surgical and nonsurgical options. [Tr. 963] Cook advised Royalty to follow-up once he received medical clearance to proceed with surgery. [Tr. 965]

Cook also received primary care from Van Breeding, M.D., at the Mountain Comprehensive Health Center, in 2016 through 2018. [Tr. 814, 821 (left shoulder pain in 2016); 801 (respiratory issues in 2017); 1035 (left knee pain in 2017); 1142-53 (back pain in 2017-2018)] An MRI of the lumbar spine in August 2018 showed multiple annular bulges with moderate to severe herniation at L5-S1. [Tr. 1297] An MRI of the neck showed moderate degenerative changes with various disc bulges and herniations throughout the cervical spine.

Dr. Breeding provided multiple medical source statements which consisted of checklists and multiple-choice inquiries regarding Cook's ability to function. First, on May 4, 2017, Breeding provided an opinion regarding Cook's cervical spine impairments. He indicated that Cook exhibited neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss, sensory or reflex loss, inability to perform fine and gross movements, severe burning or painful dysesthesia, and the need to change positions more than once every two hours. Breeding reported that Cook's pain was extreme and that he could stand for 15 minutes at one time. He indicated that Cook also could sit for only 15 minutes at a time and that he could occasionally and frequently lift five pounds. Finally, Dr. Breeding reported that Cook could rotate his neck, elevate his chin, and bring his chin to his neck, to a limited extent. [Tr. 863]

Breeding also provided a statement regarding Cook's low back pain on May 4, 2017. [Tr. 861] He indicated that Cook had limited spinal motion, motor loss, sensory or reflex loss, severe burning or painful dysesthesia, chronic non-radicular pain and weakness, and an inability to ambulate effectively. Breeding opined that Cook's pain was extreme and he could stand for 15 minutes at a time. Inconsistent with the other opinion rendered the same day, he reported that Cook could sit for 30 minutes at a time and could work for two hours per day. [*Compare* Tr. 861 *and* Tr. 863.] Also inconsistent with the other opinion, Dr. Breeding indicated that Cook could not lift any amount of weight on a frequent basis. *Id.* Finally, he reported that Cook could bend and stoop occasionally. [Tr. 861]

Dr. Breeding gave additional medical source statements on July 26, 2018. An updated statement concerning low back pain indicated that Cook exhibited neuroanatomic distribution of pain, a positive straight leg test, a need to change position more than once every two hours,

- 7 -

and lumbar spinal stenosis, in addition to the previous findings.  [Tr. 1174] Similar to the previous opinion, Breeding reported that Cook could stand for 15 minutes and could sit for 30 minutes at a time.  He now indicated, however, that Cook could never bend or stoop and that he could only work for one hour per day.  *Id.*

Dr. Breeding also provided a medical statement concerning Cook's knee problems.  He indicated that the following symptoms were present in both knees: chronic pain; chronic stiffness; chronic swelling; chronic tenderness; limitation of motion; crepitus; instability; joint space narrowing; bony destruction; quadriceps atrophy; and an inability to ambulate effectively.  [Tr. 1176]  Breeding opined that Cook suffered from severe pain and was unable to work because of his knee problems.  Inconsistent with the opinion given regarding Cook's low back, Dr. Breeding indicated that Cook could stand for 30 minutes at a time.  And while Breeding reported that Cook could occasionally stoop and lift five pounds, he indicated that Cook could never lift more than five pounds, bend, balance, or climb a ladder or stairs.  *Id.*

State agency consultant Stephen Kavka, M.D., reviewed Cook's file on October 5, 2016. [Tr. 74-77]  After reviewing the existing medical evidence, Kavka determined that Cook could occasionally lift 20 pounds, frequently lift 10 pounds, sit, and stand and/or walk six hours in and eight-hour workday.  He noted that Cook would have limitations based on his moderately severe carpal tunnel syndrome and that he could only occasionally balance, stoop, crouch, crawl, or climb ramps or stairs.  [Tr. 75]  Paul Saranga, M.D. reviewed the file on January 2, 2017, and agreed with Kavka's recommendations.  [Tr. 87-92]

ALJ Stanley determined that Cook had the following severe impairments: degenerative disc disease of the cervical spine with cervicalgia; degenerative disc disease of the thoracic spine; degenerative disc disease of the lumbar spine with lumbago/sciatica/radiculopathy;

bilateral shoulder pain; bilateral carpal tunnel syndrome; osteoarthritis/degenerative joint disease of the bilateral knees; generalized osteoarthritis; inflammatory arthritis; bilateral sensorineural hearing loss; obstructive sleep apnea; chronic obstructive pulmonary disorder (COPD) by report; hypoxia by report; emphysema; coal workers' pneumoconiosis simple stage 1/0; and obesity.  [Tr. 25]

After considering the entire record, the ALJ determined that Cook had the functional residual capacity to perform light work as defined in 20 C.F.R. § 404.1567(b), except he

> can occasionally push and pull; can occasionally climb stairs and ramps, but cannot climb ropes, ladders, and scaffolds; can occasionally balance and stoop; can kneel, crouch, and crawl less than occasionally; can occasionally reach overhead; can frequently handle, finger, and feel; must avoid concentrated exposure to temperature extremes, humidity, wetness, pulmonary irritants, loud noise, and vibration; and cannot work at unprotected heights or around hazards, such as heavy equipment.

[Tr. 27]  The ALJ concluded that Cook could not perform any of his past work, which was medium, but performed at a heavy exertional level.  [Tr. 32]  However, based on the vocational expert's testimony, there were jobs existing in significant numbers in the national economy that he could perform.  [Tr. 33]  Accordingly, he was not disabled under the Social Security Act.

### III.

A "disability" under the Social Security Act is defined as "the inability to engage in 'substantial gainful activity' because of a medically determinable physical or mental impairment of at least one year's expected duration."  *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007) (citing 42 U.S.C. § 423(d)(1)(A)).  A claimant's Social Security disability determination is made by an ALJ in accordance with "a five-step 'sequential evaluation process.'"  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642 (6th Cir. 2006) (en

banc).  If the claimant satisfies the first four steps of the process, the burden shifts to the Commissioner with respect to the fifth step.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

A claimant must first demonstrate that he is not engaged in substantial gainful employment at the time of the disability application.  20 C.F.R. § 404.1520(b).  Second, the claimant must show that he suffers from a severe impairment or a combination of impairments. 20 C.F.R. § 404.1520(c).  Third, if the claimant is not engaged in substantial gainful employment and has a severe impairment which is expected to last for at least twelve months and which meets or equals a listed impairment, he will be considered disabled without regard to age, education, and work experience.  20 C.F.R. § 404.1520(d).  Fourth, if the claimant has a severe impairment but the Commissioner cannot make a determination regarding disability based on medical evaluations and current work activity, the Commissioner will review the claimant's RFC and relevant past work to determine whether he can perform his past work. 20 C.F.R. § 404.1520(e).  If he can, he is not disabled.  20 C.F.R. § 404.1520(f).

Under the fifth step of the analysis, if the claimant's impairments prevent him from doing past work, the Commissioner will consider his RFC, age, education, and past work experience to determine whether he can perform other work.  If he cannot perform other work, the Commissioner will find the claimant disabled.  20 C.F.R. § 404.1520(g).  "The Commissioner has the burden of proof only on 'the fifth step, proving that there is work available in the economy that the claimant can perform.'"  *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 785 (6th Cir. 2009) (quoting *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999)).

This Court's review is limited to determining whether the ALJ's findings are supported by substantial evidence and whether the ALJ applied the proper legal standards in reaching her decision. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is such relevant evidence as reasonable minds might accept as sufficient to support the conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). The Commissioner's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g).

## IV.

### A.   The ALJ properly considered Cook's subjective complaints of pain and gave adequate reasons for assigning little weight to Dr. Muffly's opinion.

Cook argues that ALJ Stanley gave insufficient reasons for discounting Dr. Muffly's opinion that the objective evidence supports Cook's allegations of severe pain, resulting in his inability to engage "in any gainful employment on a sustained basis."[1] [Record No. 12-2, p. 11] However, the plaintiff conflates the standards that ALJs must apply when considering opinion evidence and claimants' subjective complaints of pain. The Court will examine each of these issues, in turn.

Unlike the opinions of treating physicians, the opinions of one-time examining sources are not entitled to any special degree of deference. *Barker v. Shalala*, 40 F.3d 789, 794 (6th

---

[1]      Cook has not provided a citation to the record in support of the claim that Dr. Muffly opined that he could not engage in any gainful employment. Upon review of the administrative transcript, it appears that Muffly actually indicated that Cook could not perform his usual occupation as a roof folder operator. [*See* Tr. 10-1, p. 766.] Regardless, a medical source's opinion that Cook could not perform any gainful employment would be unpersuasive, as the ultimate issue of disability is reserved to the Commissioner. *See Niemasz v. Barnhart*, 155 F. App'x 836, 839 (6th Cir. 2005) (citing 20 C.F.R. § 404.1527(e)(1)).

Cir. 1994).  Instead, such an examiner's opinion should be weighed considering the factors

laid out in 20 C.F.R. § 404.1527(c).  In this case, the ALJ engaged in a proper analysis, noting

that Muffly's one-time examination was conducted exclusively in connection with Cook's

workers' compensation claim and that the standards for such claims are completely different

than those that apply in Social Security cases.  [Tr. 30]  Nothing in the regulations requires an

ALJ to subject a non-treating source's opinion to an explicit, factor-by-factor analysis when

determining the amount of weight it should be given.  *Bange v. Berryhill*, No. 1:17-CV-189,

2018 WL 3995951, at *2 (W.D. Ky. Aug. 21, 2018).  Further, an ALJ's "failure to discuss the

20 C.F.R. § 404.1527(c) factors is 'no reason to speculate that the ALJ did not . . . consider

them.'"  *Id.* n.2. (quoting *Buchert v. Comm'r of Soc. Sec.*, No. 3:13-CV-01418, 2014 WL

1304993, at *7 (N.D. Ohio Mar. 27, 2014)).

Additionally, Cook has not indicated how he was prejudiced by the ALJ's assessment

of Muffly's opinion.  In other words, he has not identified any portion of the RFC he believes

does not comport with  Muffly's conclusions regarding the plaintiff's allegations of pain.

Although the ALJ did not assess limitations identical to those assessed by Muffly, both agreed

that Cook would be limited to lifting 20 pounds and would be limited with respect to crawling,

climbing, and manipulation.  [*See* Tr. 27, 761.]

Cook suggests that the ALJ erred by failing to accept Muffly's conclusion that he

experienced moderate to severe pain.  However, the ALJ is not required to accept an opinion

that is premised solely on the claimant's subjective complaints.  *See Webb v. Astrue*, No. 08-

181, 2009 WL 961851, at *6 (E.D. Ky. Apr. 8, 2009); *Ramon v. Astrue*, 610 F. Supp. 2d 1078,

1082 n.7 (C.D. Cal. 2009) (rejecting an opinion that was "a parroting of the claimant's

subjective complaints").  Instead, the regulations provide a two-step process for evaluating

- 12 -

claimants' subjective complaints of pain, and the ALJ engaged in that analysis here.  *See* 20 C.F.R. § 404.1529; SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017).

The ALJ first determined that Cook had medically determinable impairments that could reasonably be expected to cause the symptoms he alleged.  *See* 20 C.F.R. § 404.1529(b).  [Tr. 57]  He noted that Cook suffered from a long history of respiratory conditions, hearing loss, musculoskeletal conditions, and obesity.  For example, Cook had been diagnosed with COPD, sleep apnea, and coal workers' pneumoconiosis.  His musculoskeletal conditions were well-documented, as various diagnostic imaging tests revealed degeneration in the cervical and lumbar spine, left knee, and moderate to severe carpal tunnel syndrome.

The ALJ concluded, however, that Cook's statements concerning the intensity, persistence, and limiting effects of these conditions were not substantiated by objective medical evidence or the other evidence of record.  *See* 20 C.F.R. § 404.1529(c).  [Tr. 30]  Despite Cook's claims of debilitating respiratory problems, he had essentially normal pulmonary testing and did not require supplemental oxygen during the administrative hearing.  [Tr. 29]  Cook alleged that the mine where he worked closed down the day after Dr. Pampati "took him off work" in June 2016.  [Tr. 52]  However, Pampati's June 30, 2016 progress note states: "He has been having difficulty working. . . .  He tells me recently the mines have been shut down and he has been transferred to Virginia and he is afraid that he may fail the physical exam due to problems."  [Tr. 938]  Despite the chronic and relatively stable nature of his allegedly severe conditions, Cook advised the ALJ that he never missed a day of work.  [Tr. 60]

The ALJ also noted that, despite Cook's complaints of severe pain, he continued to choose conservative management of his conditions.  Despite multiple doctors encouraging

both carpal tunnel and knee surgery, Cook declined to undergo the procedures.  And although Cook alleged hearing loss, he advised the ALJ that his hearing was "alright" and he did not wear hearing aids.  [*See* Tr. 58]

The ALJ's credibility determinations are given great weight, particularly since the ALJ is tasked with observing the claimant's demeanor and credibility.  *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007).  Cook has not identified any error in the ALJ's application of the two-step process to his subjective complaints of pain.  Accordingly, there is no basis to disturb the ALJ's ruling on this ground.

**B.      The ALJ did not err in weighing the remaining medical opinions.**

Cook contends that the ALJ erred in assigning little weight to Dr. Breeding's opinions. For claims such as Cook's, which were filed before March 27, 2017, the opinions of treating physicians generally are entitled to controlling weight when they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the case record.  When the ALJ does not give such opinions controlling weight, he or she must provide "good reasons" to explain the amount of weight given. [2]   *See Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011); 20 C.F.R. § 404.1527(c)(2).

The ALJ acknowledged that Breeding was Cook's treating physician and reviewed the most restrictive limitations from Breeding's May 2017 and July 2018 assessments.  [Tr. 31] In deciding to give the opinions "little weight," the ALJ noted that the assessments were

---

[2]      The "treating source rule" has been eliminated for claims filed on or after March 27, 2017.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); 20 C.F.R. §§ 404.1527; 404.1520c.

- 14 -

provided by way of "checkbox" forms, "with little explanation or analysis." Further, the course of treatment was not consistent with what one would expect if the claimant "truly were as limited as the doctor [had] reported." Finally, the ALJ noted, the assessments were inconsistent with the objective medical evidence. *Id.*

While the ALJ did not discuss every factor listed in § 404.1527(c)(2), he provided sufficient reasons for giving Breeding's opinions little weight. Most notably, Breeding's extremely restrictive opinions were not supported by any reference to objective evidence, including treatment notes. While Breeding made broad references to symptoms that might have been present (e.g., "limitation of motion of the spine"), there is no indication that Breeding actually based these findings on objective clinical findings. Further, as the ALJ pointed out, Breeding's conservative treatment of Cook, without further explanation, does not support the extreme limitations he assessed.

Checklist or "circle-the-answer" forms, like the ones Breeding submitted, are "weak evidence at best." *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016) (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)). An insufficient discussion of the § 404.1527(c) factors is harmless error when a treating source's opinion is patently deficient. *See id.* at 474. The procedural rule of requiring a statement of good reasons for giving less than controlling weight to a treating physician's opinion permits meaningful review of the ALJ's decision and lets claimants know why the ALJ did not follow the opinion of their treating physician. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Here, the ALJ "identif[ied] specific discrepancies" within Breeding's opinions and clearly explained why they got "the short end of the stick." *See Hernandez*, 644 F. App'x at 473. Accordingly, the goal of the reasons-giving requirement is satisfied and this argument fails.

- 15 -

Cook also contends that the ALJ erred by assigning little weight to the opinion of treating source Dr. Pampati.  However, it appears that Pampati's only opinion was that Cook was completely disabled from any occupation.  This opinion was not entitled to any weight because the ultimate issue of disability is reserved to the Commissioner.  *See Niemasz v. Barnhart*, 155 F. App'x 836, 839 (6th Cir. 2005); 20 C.F.R. § 404.1527(d)(3).

Cook also faults the ALJ for failing to discuss various exhibits including treatment notes from Ace Clinique of Medicine, Pikeville Neurology Clinic, Appalachian Rehabilitation Center, Dr. Ellen Ballard, Dr. Robert Royalty, and evidence regarding Cook's hearing loss. There is no requirement that the ALJ discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.").  Many of these records are cumulative and/or remote in time to Cook's alleged onset of disability.  Further, there is nothing to suggest that the ALJ failed to address the alleged impairments treated by these providers.  Cook does not identify any prejudice that he suffered as a result of the ALJ's failure to explicitly discuss any of the evidence he has identified.  Accordingly, this argument fails.

### C.    The ALJ considered the combined effects of Cook's impairments.

ALJs must "consider the combined effects of impairments that individually may be non-severe, but which in combination may constitute a medically severe impairment or otherwise evince a claimant's disability."  *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988); 20 C.F.R. § 404.1523.  This analysis is satisfied where, as here, the ALJ considers the claimant's impairments, "singly and in combination," and determines that they do not equal a listing under 20 C.F.R. Appendix 1 to Subpart P of Part 404.  [Tr. 27]  ALJ Stanley's decision

- 16 -

was made after careful consideration of the entire record, and each of the claimant's impairments was discussed individually. *Zandstra v. Comm'r of Soc. Sec.*, 2008 WL 350655 (W.D. Mich. Feb. 6, 2008) (citing *Gooch v. Sec. of Health & Hum. Servs.*, 833 F.2d 589, 592 (6th Cir. 1987)).

The plaintiff has not identified authority indicating that anything more is required with respect to the ALJ's analysis on this issue. *See Estes v. Astrue*, No. 10-343-KSF, 2011 WL 3903090 (E.D. Ky. Sept. 6, 2011) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to  . . . to put flesh on its bones.").

### D.    The ALJ's Decision is Supported by Substantial Evidence.

The ALJ assigned great weight to the opinions of state agency medical consultants Kavka and Saranga.  [Tr. 30]  The ALJ noted that these opinions were supported by detailed explanations, rationales, and analyses of the available medical evidence of record at the time. Additionally, the ALJ found these assessments to be consistent with the medical observations throughout the adjudicatory period.   State agency consultative opinions may constitute substantial evidence supporting an ALJ's opinion.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009); *Conway v. Berryhill*, No, 1: 18-cv-218, 2018 WL 7079488, at *8 (N.D. Ohio Dec. 17, 2018) (collecting cases).

Cook argues that ALJ Stanley's reliance on the consultants' opinions was improper because the record was incomplete when they rendered their opinions.  However, Kavka reviewed the results of Cook's recent physical exam, in detail, and explained that various functions would be limited due to particular physical impairments.  [Tr. 75-76]  Saranga issued

- 17 -

his opinion on January 2, 2017, apparently based on the same evidence.  Like Kavka (and unlike Breeding), Saranga discussed specific portions of the objective medical evidence, how it related to Cook's impairments, and ultimately what functional limitations would impact Cook's ability to work.  [Tr. 86-87]

As Cook points out, Kavka's and Saranga's opinions pre-date some of the medical evidence of record.  However, this does not necessarily mean that their opinions are unreliable or cannot constitute substantial evidence.  The ALJ recognized that Kavka and Saranga submitted their assessments on October 5, 2016, and January 2, 2017, respectively, and were based on the evidence available up to that time.  The ALJ also noted that the assessments were supported by detailed explanations, rationales and analyses of the "available medical evidence of record at the time."  [Tr. 31]  Implicit in the ALJ's analysis is the conclusion that any later medical evidence does not alter Kavka's and Saranga's findings.  *See Blakley*, 581 F.3d at 409 (ALJ must acknowledge that non-examining source's opinion is based on incomplete record before giving it greater weight than treating source opinion).

Notably, Cook does not identify any particular evidence that Kavka and Saranga should have had an opportunity to consider or that might have changed their conclusions.  Cook's subjective complaints, and the results of objective testing, remained stable throughout the adjudicative period.  Only Dr. Breeding's opinions differed significantly from the conclusions reached by the state consultants and, for the reasons already explained, it is not reasonable to believe that the consultants would have altered their opinions based on Breeding's patently deficient reports.

Accordingly, for the reasons discussed above, it is hereby

**ORDERED** as follows:

- 18 -

1.      Plaintiff Willis D. Cook's motion for summary judgment [Record No. 12] is **DENIED**.

2.      Defendant Commissioner of Social Security's motion for summary judgment [Record No. 14] is **GRANTED**.

Dated:  June 17, 2020.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky